IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Quorum Health Corporation, | ) | Case No. 20-10766 (BLS) |
| | ) | |
|     Reorganized Debtor. | ) | |
| | ) | |
| Rajeev Varma, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | Adv. Proc. No. 20-51053 (BLS) |
| | ) | |
| Quorum Health Corporation, | ) | |
| | ) | |
|     Defendant. | ) | |

**<u>OPINION</u>**

The plaintiff, Dr. Rajeev Varma, M.D. (the "Plaintiff") commenced the above-captioned adversary proceeding by filing a complaint[1] against Quorum Health Corporation (the "Reorganized Debtor" or "Quorum") to revoke the order of confirmation of the Reorganized Debtor's Plan of Reorganization. The Reorganized Debtor and Senior Noteholders[2] have moved to dismiss the Complaint in its entirety. For reasons that follow, the Court will grant the Reorganized Debtor's and Senior Noteholders' Motions.

---

[1] Adv. D.I. 1, as subsequently amended [Adv. D.I. 20].
[2] "Senior Noteholders" refers to the former members of the "Ad Hoc Noteholder Group," as defined in the Verified Statement of the Ad Hoc Noteholder Group Pursuant to Bankruptcy Rule 2019 [D.I. 165]. The Ad Hoc Noteholder Group was disbanded on the effective date of the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization [D.I. 556-1].

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157, as well as the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (L) and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has the power to enter an order on a motion to dismiss even if the matter is non-core or the Court lacks authority to enter a final order.[3]

## BACKGROUND[4]

I.   **The Spin-off**

On April 29, 2016, roughly four years before the commencement of its Chapter 11 case, Quorum was formed through a spin-off from Community Health Systems, Inc. ("CHS"), resulting in the creation of an independent company consisting of 38 hospitals, affiliated outpatient service facilities, and an affiliated advisory and consulting services firm.[5] To facilitate the spin-off, 100% of Quorum's common stock was distributed to CHS stockholders of record on April 22, 2016 (the "Record Date").[6] The distribution

---

[3] *See, e.g., Boyd v. Kind Par, LLC*, No. 1:11-CV-1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011); *see also In re Amcad Holdings, LLC*, 579 B.R. 33, 37 (Bankr. D. Del. 2017).
[4] Pursuant to Fed. R. Civ. P. 52 (made applicable here through Fed. R. Bankr. P. 7052), the Court does not make findings of fact for purposes of a decision on a Fed. R. Civ. P. 12 motion. Factual allegations set forth herein are derived from the Plaintiff's Complaint.
[5] *See* Disclosure Statement, at 8.
[6] *See* QHC 10-K (Dec. 31, 2017), at 3.

resulted in each CHS shareholder receiving one share of Quorum common stock for every four shares of CHS common stock as of the record date.[7]

Following the spin-off, on April 22, 2016, Quorum borrowed approximately $400 million through the issuance of the unsecured Senior Notes. The following week, on April 29, 2016, Quorum entered into a credit agreement consisting of an $880 million senior secured loan facility (the "Term Loan Facility"), a $100 million senior secured revolving credit facility (the "Revolving Credit Facility"), and a $125 million senior secured asset-based revolving credit facility (the "Senior Credit Facility").[8] The net offering proceeds of the Senior Notes, in conjunction with the net borrowing under the Term Loan Facility, were used to make a $1.2 billion payment from Quorum to CHS, and to pay Quorum's related transaction and financing fees and expenses.[9]

Quorum further entered into certain agreements with CHS that governed or continue to govern matters related to the spin-off. Included in these agreements are, amongst others, a separation and distribution agreement, a tax matters agreement, an employee matters agreement, and various transition services agreements.[10] In connection with the separation and distribution agreement, CHS contributed $530.6 million of paid-in capital to Quorum and made a $13.5 million cash contribution with the intention of helping capitalize Quorum's go-forward business.[11] The transition services agreements had five year terms that provided, among others, services related to information technology, payroll processing, certain human resources functions,

---

[7] *See id*.
[8] *See* Disclosure Statement at 12—13.
[9] *See* Disclosure Statement at 8.
[10] *See* QHC 10-K (Dec. 31, 2017), at 3.
[11] *See* Disclosure Statement, at 8.

patient eligibility screening, billing, collections, and other revenue generating services. These services expired on April 29, 2021.[12]

Following the spin-off, Quorum struggled with its over-leveraged capital structure and engaged in a series of divestitures, closing or divesting 15 of the 38 hospitals.[13] The company continued to struggle due to factors such as a deterioration of its revenue cycle, declining performance, and liquidity constraints, all of which eventually culminated into Quorum's Chapter 11 filing.[14] Prior to the bankruptcy filing, Quorum had entered into a restructuring support agreement with holders of approximately 75% of its first-lien debt and approximately 97% of its senior notes.

## II. The Chapter 11 Cases & Reorganization

On April 7, 2020 (the "Petition Date"), Quorum and 134 affiliates (collectively, the "Reorganized Debtors") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code (collectively, the "Chapter 11 Cases") in the District of Delaware; the cases were jointly administered.[15] The Office of the United States Trustee for the District of Delaware declined to appoint an official committee, trustee, or examiner in the Cases. The Reorganized Debtors filed their plan of reorganization on the Petition Date.

The Reorganized Debtors filed the Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization (the "Disclosure Statement") on April

---

[12] *Id*.
[13] *See* Disclosure Statement, at 16.
[14] *Id*. at 16—20.
[15] A complete list of the 135 jointly administered chapter 11 debtors (the "Debtors") can be found in D.I. 58. A majority of the cases have now been closed.

8, 2020.[16] Following these submissions, the Court entered an order on April 13, 2020 which, amongst other things, scheduled a combined hearing for approval of the Disclosure Statement and confirmation of the Plan, approved solicitation procedures, and waived the requirements that the Reorganized Debtors file statements of financial affairs and schedules of assets and liabilities (the "Scheduling Order").[17]

Under the Plan, Allowed Unsecured Claims were paid in full in the ordinary course of business, making them unimpaired and ineligible to vote.[18] Only holders of First Lien Loan Claims (Class 4) and holders of Senior Notes Claims (Class 5) were entitled to vote on the Plan.[19] Class 4 and 5 claimants who submitted ballots voted almost unanimously to accept the Plan.[20] This Court entered the *Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*[21] (the "Confirmation Order") on June 30, 2020, approving the Disclosure Statement and confirming the Plan. The Plan became effective on July 7, 2020 (the "Effective Date").[22]

### III.     The QHC Litigation Trust

Pursuant to the terms of the Plan and on the Effective Date, the Reorganized Debtor created the QHC Litigation Trust. The Trust was created pursuant to an agreement between Senior Note Holders and the Reorganized Debtor ("the QHC

---

[16] D.I. 22.
[17] *See* D.I. 137.
[18] *See* Plan, at Art. III(B)(6).
[19] *See* Disclosure Statement, at iii; Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization [D.I. 294].
[20] *See* Voting Declaration, at Ex. H.
[21] *See* D.I. 556.
[22] *See* D.I. 568.

Litigation Trust Agreement"),[23] and its purpose was twofold: to (i) prosecute and/or settle certain causes of action and (ii) liquidate and ratably distribute any proceeds obtained from any such litigation, arbitration or settlement (the "QHC Litigation Trust Interests") to the holders of Senior Notes Claims (the "QHC Litigation Trust Beneficiaries").[24] The QHC Litigation Trust was likewise funded on the Effective date using certain trust assets (the "QHC Litigation Trust Assets" or "QHC Litigation Trust Causes of Action") including:

(a) any Cause of Action arising under or based on sections 542, 543, 544 through 548, 550, or 553 of the Bankruptcy Code, any state law fraudulent transfer, fraudulent conveyance, or voidable transaction law, or any statute limiting or prohibiting transfers to shareholders;
(b) any Cause of Action relating to fraudulent transfer, fraudulent conveyance, voidable transaction, illegal dividend, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, alter ego, or unjust enrichment, and
(c) the Contributed Claims, which include any prepetition Cause of Action relating to the Senior Notes held by any of the holders of Senior Notes Claims that elected to contribute such claims to the QHC Litigation Trust arising under or based on state, federal, or common law, including but not limited to fraudulent transfer, fraudulent conveyance, voidable transaction law, any statute limiting or prohibiting transfers to shareholders, and alter ego.[25]

On the Effective Date, all claims arising under Chapter 5 of the Bankruptcy Code and analogous state law state law causes of action were assigned to the QHC Litigation Trust and are no longer property of the Reorganized Debtor. Under the terms of the Plan, the QHC Litigation Trustee was empowered to prosecute or settle any of the QHC Litigation Trust Causes of Action subject to the consent of (i) the Reorganized Debtors and (ii) the Required Consenting QHC Litigation Trust Beneficiaries.[26] However, following September 30, 2021, the commencement of any QHC litigation Trust Cause of

---

[23] *See* Plan Art. IV.C.3; *see also* D.I. 483, Ex. J, at 2.
[24] *Id*.
[25] *See* Plan Arts. I.A.30, 124.
[26] *See* Plan Art. IV.C.3.

Action by the QHC Litigation Trust was subject to the QHC Litigation Trust's sole and exclusive discretion, consistent with the QHC Litigation Trust Agreement.[27]

## IV.  The Closing of the Affiliate Cases

The Reorganized Debtors filed the *Motion of Reorganized Debtors for Entry of Final Decree Closing Certain Chapter 11 Cases*[28] on September 25, 2020, seeking to close all of the Chapter 11 Cases except for (i) the case of Quorum Health Corporation (the "Lead Case") and (ii) the Galesburg Cases, which were dismissed in June 2020 in connection with the sale of the equity interests in those entities. This Court then entered the *Final Decree Closing Certain Chapter 11 Cases* (the "Final Decree"), formally closing those cases.[29]

## V.  Dr. Varma's Adversary Proceeding

Dr. Varma commenced his adversary proceeding on December 28, 2020, by filing a complaint (the "Original Complaint"). The process has been fraught with procedural and substantive errors. Service of the Original Complaint was completed via e-mail to the Reorganized Debtor's counsel at 11:58 PM ET on March 29, 2021, 91 days after the filing of the Original Complaint and without first obtaining counsel's written consent.[30] A copy of the Original Complaint was not attached to the Summons and the Reorganized Debtor was never served with any corresponding physical documents. The

---

[27] The QHC Litigation Trustee has commenced a lawsuit for the purpose of pursuing claims against the estate, some of which are similar to those articulated by Dr. Varma in his pleadings. *See* Adv. Pro. No. 21-51190.
[28] D.I. 649.
[29] D.I. 667.
[30] On March 29, 2021, Dr. Varma called the Reorganized Debtor's counsel at her home phone number. *See* Adv. D.I. 7-1. The parties disagree as to whether Debtor's counsel consented to electronic service of the Summons. However, it is undisputed that Dr. Varma did not obtain counsel's written consent to electronic service of the Summons, as the Federal and Bankruptcy Rules require.

7

Summons was filed on the following day (March 30, 2021) without attaching the Original Complaint.[31] Likewise, no certificate of service alleging sufficient service of process on the Reorganized Debtors, or its counsel was filed, though required by Rule 7004-2.

On April 19, 2021, Dr. Varma also sought an extension of the deadline for filing an amended Complaint. This Court, after a hearing on the matter, ultimately granted his request and extended the deadline by two weeks from April 19, 2021 to May 3, 2021.[32] The Amended Complaint was filed on May 3, 2021, and contained, amongst other things, several new allegations and additional information.[33] Dr. Varma never served the Amended Complaint on the Debtor or its counsel.[34] The contents of the Amended Complaint contained allegations relating to Dr. Varma's grievances with Quorum's pre-petition management, staffing, treatment practices, amongst other personal issues.[35] In one instance, the Amended Complaint also lists purportedly material facts that the Reorganized Debtor failed to include in its Disclosure Statement.[36] The lack of material facts in the Disclosure Statement appears to be the basis of Dr. Varma's complaint. Dr. Varma asserts that these facts were omitted "to impair the Court, the creditors and interested parties from making an informed judgment regarding the Plan."[37]

---

[31] *See* Adv. D.I. 7.
[32] *See* D.I. 770.
[33] *See*, e.g., Am. Compl. ¶¶ 14-37.
[34] *See* D.I. 22.
[35] *See*, e.g., Am. Compl. ¶¶ 15-17, 24-28.
[36] *See* Am Compl. ¶¶ 30, 44.
[37] Id. ¶ 21.

## DISCUSSION

The Reorganized Debtor and Senior Noteholders have cited various arguments in support of dismissal of the Amended Complaint, including lack of standing under Fed. R. Civ. P. 12(b)(1), insufficient service of process under Fed. R. Civ. P. 12(b)(5), failure to state a claim under Fed. R. Civ. P. 12(b)(6), equitable mootness, and lack of compliance with the 180-day deadline set forth in Bankruptcy Code §1144.[38] While each of these arguments hold significant weight,[39] this Court need not reach them all today. This Court finds the movants' motion to be sufficient on the issue of standing alone.

The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.[40] Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true.[41]

---

[38] *See* Adv. D.I. 21, 22, 23.
[39] The Court notes that Dr. Varma is appearing *pro se* in this matter. Case law dictates that *pro se* pleadings are to be liberally construed (*see United States v. Day*, 969 F.2d 39, 46 (3d Cir. 1992)), and this Court has repeatedly offered flexibility and patience to Dr. Varma. It is also true however, that the rules of procedure apply equally to *pro se* litigants and represented parties. *Thompson v. Target Stores*, 501 F. Supp. 2d 601, 603 (D. Del. 2007); *see also McNeil v. U.S.*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). For the avoidance of doubt, the Court notes that Dr. Varma has repeatedly failed to comply with applicable rules and deadlines; the Court today reaches only the substantive issue of standing with the intention of providing a decision on the issues raised that is not predicated entirely upon procedural default. *Accord, Dole v. Arco Chemical Co.*, 921 F.2d 484, 487 (3d Cir. 1990) ("This approach ensures that a particular claim will be decided on the merits rather than on technicalities.").
[40] *See Paul v. Intel Corp.* (*In re Intel Corp. Microprocessor Antitrust Litig.*), 496 F.Supp. 2d 404, 407 (D. Del 2007).
[41] *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir. 1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir. 1996).

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court may dismiss a complaint for lack of subject matter jurisdiction.[42] Because standing is a jurisdictional matter, a motion to dismiss for want of standing is appropriate under Rule 12(b)(1).[43] A party must meet the same standing requirements in a bankruptcy case as it would for any federal cases filed under Article III of the Constitution.[44]

Constitutional standing requires pleadings that demonstrate (1) a legally recognized injury that is both concrete and particularized, as well as actual and imminent (injury-in-fact); that is (2) caused by or fairly traceable to the defendant (causation); and (3) redressable by a favorable judicial decision (redressability).[45] The "critical question" is whether the plaintiff "has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction."[46]

Standing in a bankruptcy case is also governed by Bankruptcy Code §1109(b), which provides that "[a] party in interest, including the Reorganized Debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be

---

[42] *Gavin/Solmonese LLC v. Citadel Energy Partners, LLC (In re Citadel Watford City Disposal Partners, L.P.),* 603 B.R. 897, 902 (Bankr. D. Del. 2019).

[43] *Id.*

[44] *Id.*; "Standing to sue is a constitutional prerequisite to maintaining an action in federal court." *Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 244, 253 (D. Del. 2009); *Marion v. TDI Inc.,* 591 F.3d 137, 147 (3d Cir. 2010) ("[S]tanding, because it implicates a federal court's authority to hear a case, must be addressed as a threshold matter."); *see also Dover Historical Soc'y v. City of Dover Planning Commc'ns*, 838 A.2d 1103, 1110 (D. Del. 2003) ("Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a case or controversy that is appropriate for the exercise of the court's judicial powers.").

[45] *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2002) (citations omitted); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011).

[46] *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 318 (W.D. Pa. 2014) (citing *Horne v. Flores*, 557 U.S. 433, 445 (2009)); 7 Collier on Bankruptcy ¶ 1109.04[4][a] (16th ed. 2020).

heard on any issue in a case under this chapter."[47] The party-in-interest standard, which has been described as "anyone with a legally protected interest that could be affected by a bankruptcy proceeding,"[48] and the constitutional standing requirements are effectively coextensive.[49] While §1109(b) has been construed broadly to encourage participation in Chapter 11 cases, the Plaintiff must still demonstrate sufficient constitutional standing to bring the Amended Complaint.[50]

Reviewing the facts in a light most favorable to Dr. Varma, the Amended Complaint asserts no injury-in-fact sufficient to establish his constitutional standing under Article III. As noted above, Dr. Varma lays out a series of allegations in the Amended Complaint, almost all of which purport to demonstrate prepetition mismanagement by the Reorganized Debtor's employees and officers, including allegations of fraud.[51] However, these allegations do not pertain to Dr. Varma himself. The crux of Dr. Varma's argument is that the Reorganized Debtor failed to include material facts in its Disclosure Statement.[52] As noted above, Dr. Varma asserts that these facts were omitted "to impair the Court, the creditors and interested parties from making an informed judgement regarding the Plan." However, none of these allegations, even assuming *arguendo* that they are true, demonstrate an injury-in-fact to Dr. Varma. Dr. Varma is part of the class of General Unsecured Creditors whose claims were unimpaired under the plan and, as a result, not entitled to vote nor receive

---

[47] 11 U.S.C. § 1109(b).
[48] *Carr v. JP Morgan Chase Bank, N.A. (In re New Century TRS Holdings, Inc.)*, 505 B.R. 431, 438 (Bankr. D. Del. 2014) *quoting Matter of James Wilson Associates,* 965 F.2d 160, 169 (7th Cir. 1992).
[49] *See In re Global Indus. Techs., Inc.,* 645 F.3d 201, 210 (3d Cir. 2011).
[50] *Id*.
[51] *See* Am. Compl ¶¶ 20-40.
[52] *See* Am. Compl ¶¶ 30, 44.

a copy of the Plan or the Disclosure Statement.[53] The contents of the Disclosure Statement do not affect his rights or distribution under the Plan. In this context, claims of insufficient disclosure are only appropriately raised by classes entitled to vote under the Plan, namely the impaired holders of First Lien Loan Claims and Senior Notes Claims – neither of which are parties to this action.[54] Without any other allegations of harm, the Amended Complaint fails to demonstrate a cognizable harm to Dr. Varma or a personal stake in the outcome of this proceeding. Dr. Varma has therefore not met the injury-in-fact requirements of constitutional standing, or the party in interest standard of Bankruptcy Code §1109(b). Similarly, without an injury to Dr. Varma, there is no harm for this Court to redress by revoking the Confirmation Order. Instead, revoking the Confirmation Order is more likely to cause harm to the Debtors' creditors. Accordingly, the Court concludes that the Plaintiff does not have standing to assert the claims set forth in the Complaint.

Finally, in connection with the requirement of redressability, the Court is cognizant of the prospect of harm to third parties in the event that Dr. Varma was successful in obtaining revocation of the Confirmation Order. It is undisputed that consummation of the confirmed Plan resulted in transfers of millions of dollars, and innocent creditors and parties have acted in reliance upon the confirmed Plan for nearly three years. Bankruptcy Code §1144(1) expressly requires that revocation of a confirmation must be accomplished by "such provisions as are necessary to protect any

---

[53] *See* D.I. 137, at ¶ 16 ("The Debtors are not required to mail a copy of the Plan or the Disclosure Statement to Holders of Claims that are (a) Unimpaired and conclusively presumed to accept the Plan or (b) Impaired and deemed to reject the Plan but shall do so upon request from such Holders of Claims.").
[54] *See In re Delta Air Lines, Inc.,* 386 B.R. 518, 533–34 (Bankr. S.D.N.Y. 2008) (cautioning courts from exercising discretion under section 1144 where none of the other voting creditors joined in or supported suit to revoke).

entity acquiring rights in good faith reliance on the order of confirmation."[55] Nothing in the Complaint suggests that relief could be fashioned in favor of Dr. Varma that would comply with the clear mandate of Section 1144(1).

## **CONCLUSION**

For the reasons stated above, this Court will GRANT the Reorganized Debtor and Senior Noteholder's Motions to Dismiss with prejudice. An appropriate order follows.

BY THE COURT

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: January 12, 2023
    Wilmington, Delaware

---

[55] *See* 11 U.S.C. §1144(1).